# EXHIBIT B

# Future Receivables Sale & Merchant Cash Advance Agreement

This Future Receivables Sale & Merchant Cash Advance Agreement, which includes the Order Form and any substantially similar order form signed in the future by both parties, (this "Agreement") is effective as of the latter date of: (i) the date of acceptance by on behalf of the business entity listed as "Seller" in the Order Form (the "Seller", "you", "your"); and (ii) the date of acceptance by Silo Technologies, Inc., a Delaware corporation ("Silo"). A subsequent Order Form becomes part of this Agreement when signed by both parties.

This Agreement incorporates by reference all terms and conditions of Silo's Terms of Use (available at usesilo.com/terms) and Privacy Policy (available at usesilo.com/privacy), unless explicitly superseded by this Agreement. In the event of a conflict between the terms of this Agreement and of the Terms of Use or Privacy Policy, this Agreement shall govern with respect to the subject matter of such conflicting terms.

**PLEASE READ THIS AGREEMENT CAREFULLY. AMONG OTHER THINGS, A BINDING ARBITRATION PROVISION THAT CONTAINS A CLASS ACTION WAIVER.**

## 1. Purchase of Receivables

1.1 <u>Purchase & Sale</u>. Seller hereby sells to Silo as absolute owner all Silo Receivables until Silo receives the Total Remittance Amount pursuant to the terms of this Agreement. Silo shall pay Seller the Purchase Price in exchange for the Silo Receivables.

1.2 <u>Parties' Intention</u>. The parties intend that the sale of Silo Receivables under this Agreement is a true sale of the Silo Receivables for all purposes. Each such sale is subject to the terms of the Agreement, absolute and irrevocable, providing Silo with the full risks and benefits of ownership of the Silo Receivables (such that the amounts payable under such Silo Receivables would not be property of the estate in any bankruptcy proceeding in which Seller is the debtor or debtor in possession).

## 2. Risk Assumption

Silo is entering into this Agreement knowing the risks that Seller's business may decline or fail or that Seller may generate Silo Receivables more slowly than anticipated. Seller will not have any further financial obligations to Silo if it does not pay the Total Remittance Amount due to bankruptcy, or Seller's business ceasing in the ordinary course ("Events of Assumed Risk"); provided however, that Silo assumes these risks based on Seller's representations, warranties, and covenants in this Agreement, which are designed to give Silo a reasonable and fair opportunity to receive the benefit of its bargain. Thus, Silo retains recourse against Seller for all losses that do not arise out of Events of Assumed Risk.

## 3. Remittance of Receipts

3.1 <u>Remittance via ACH; Authorization</u>. Seller shall remit to Silo the Estimated Periodic Remittance in accordance with the terms of this Agreement. To effectuate such remittance, Seller hereby authorizes Silo to debit the Bank Account for the Estimated Periodic Remittance each Remittance Period. Seller shall promptly

provide any assistance requested by Silo, its designees, or a financial institution to confirm that Seller has authorized debits via to the Bank Account to remit funds to Seller in accordance with this Agreement.

3.2 Reconciliation. The Estimated Periodic Remittance is calculated by Silo as the product of (A) the Specified Receivables Percentage; and (B) the Receivables that Silo estimates that Seller will receive during future Remittance Periods prior to Silo's receipt of the Total Remittance Amount. In the event that Silo has received an amount greater than the Specified Receivables Percentage of the Receipts (an "Overpayment"), Silo shall reimburse Seller in the amount of such Overpayment promptly upon Seller's reasonable request, and may adjust its estimate of the Receivables that will be received during future Remittance Periods, subject to Silo's right to offset any other amounts that Seller is obligated to pay Silo.

## 4. Limited Agency Appointment

Silo hereby appoints Seller as Silo's duly authorized agent and attorney-in-fact, and Seller hereby accepts such appointment and agrees to act as Silo's duly authorized agent and attorney-in-fact at Seller's own expense, for the limited purpose of (i) collecting and holding the Silo Receivables in trust for Silo in the Bank Account and (ii) administering the Receivables for Silo's benefit. Seller agrees that it shall not hold itself out as Silo's agent and attorney-in-fact for any other purpose. Seller's appointment as Silo's agent and attorney-in-fact may be varied or terminated by Silo at any time upon notice to Seller.

## 5. Seller Promises and Authorizations

5.1 Data Access. Seller authorizes Silo to access and use any Customer Data to verify and confirm receipt by Seller of the Receivables, to aid in calculating the Estimated Periodic Remittance and facilitating its remittance, and otherwise ensure that Seller is in compliance with this Agreement. Seller agrees to link its Bank Account to the Platform such that Bank Account transaction data shall constitute Customer Data. Seller agrees not to take any action to limit Silo's access to or reduce the extent of the Customer Data.

5.2 Customer Communications. Seller authorizes Silo to communicate directly with Customers with respect to any of payment, invoice, or Receivable related to the Customer, including Receivables not sold to Silo, for any reason, including, without limitation, to remind Customers of upcoming due dates, and to verify the amount and validity of Receivables.

5.3 Business Operation. Seller shall use best efforts to continue to operate and maintain its business and related volumes in its business as disclosed to Silo. Seller shall maintain appropriate insurance for its business, not reduce any existing insurance coverage, and promptly show proof of insurance to Silo on request.

5.4 Receivables; Bank Account.

(a) Seller shall, as Silo's agent and attorney-in-fact, cause all Silo Receivables and all funds received in connection therewith to be deposited into the Bank Account and held in trust for Silo in the Bank and collect all Receivables diligently and promptly in accordance with applicable law;

(b) Seller shall not, other than to Silo, sell transfer, convey or otherwise dispose of the Receivables, or Seller's assets or business or take any action that would interfere with Silo's right to receive the Silo Receivables or access any of the Receipts in the Bank Account, nor create, agree to or otherwise acquiesce to the creation of any claim, lien, security interest or encumbrance of any kind with respect to

  any of the Receivables or the Bank Account, and not enter into any deposit account control agreement related to the Bank Account;

(c) Seller shall not divert or otherwise transfer any of the Receivables from the Bank Account to any other account with or held by any institution without the express prior written permission of Silo, nor take any steps to avoid or circumvent Seller's promise to remit the Remittance Amount or otherwise conceal the Receivables or Silo Receivables from Silo;

(d) Seller shall not close the Bank Account nor deny Silo access thereto, nor shall Seller instruct nor, except to the extent prohibited by applicable law, acquiesce to, any bank or other Person closing such Bank Account or denying Silo access thereto. Seller shall not put a stop order or block any ACH Advance or other payment of Receivables to Seller, or taking any action that results in a stop order or block;

(e) Seller shall use best efforts to contest, at Seller's own cost and expense, any adverse claim made by a third party with respect to the Silo Receivables (other than by Silo) and be available, at Seller's own cost and expense, to testify in any legal action and cooperate in any way at Silo's request in connection with any proceeding relating to the Silo Receivables, including production of any records or documents; and

5.5 <u>Notifications; Information Request</u>.

(a) Seller shall give Silo seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Seller's assets.

(b) Seller shall not change its name under § 9-503 of the UCC, entity type or state of formation, unless it has provided Silo with not less than thirty (30) days' prior notice thereof and has provided Silo with any documents, agreements and information reasonably requested by the Silo with respect thereto.

(c) Seller shall promptly notify Silo in writing of any change in Seller's officers or directors or of any material adverse change in the business or financial affairs of Seller.

(d) Seller shall provide any information reasonably requested by Silo with respect to its business.

5.6 <u>Applicable Law</u>. Seller shall comply in all respects with this Agreement and with applicable law.

5.7 <u>Defense</u>. If any action or proceeding is instituted by or against Seller with respect to the Seller Receivables or in any manner relating to Seller, Seller shall, at Seller's own expense, make available Seller and its officers, employees and agents, and its books and records, to the extent that Silo may deem them reasonably necessary in order to pursue or defend any such suit or proceeding. Seller shall also, at Seller's own expense, promptly execute any declaration or give such testimony as Silo deems necessary with respect to such litigation or proceeding.

## 6. Seller Representations, Warranties, Covenants

(a) Seller represents and warrants that prior to execution of the Agreement, Seller is the sole, legal and beneficial owner of the Receivables;

(b) Seller represents and warrants that it owns the Bank Account and is authorized to access, debit, and provide authorization to Silo to debit the Bank Account; and that the Bank Account is not subject to any lien, security interest, control agreement, or other limitation or restriction that may prevent access to the funds associated with the Bank Account;

(c) Seller represents and warrants that Seller's name, as indicated in this Agreement, is Seller's name under § 9-503 of the UCC.

(d) Seller represents and warrants that is a corporation, limited liability company, partnership or limited partnership duly incorporated, organized or formed, as applicable, and validly existing in its applicable state of incorporation or formation. Seller represents and warrants that it is in good standing in such state and any other jurisdiction where Seller's activities so require;

(e) Seller represents and warrants that its execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary corporate, limited liability company, partnership or limited partnership action, as applicable;

(f) Seller represents and warrants that its execution, delivery and performance of this Agreement does not violate or otherwise conflict with any law or any term or provision of any of its governing documents or any other agreement to which Seller is a party or by which Seller's properties or assets are bound, and will not result in the creation or imposition of any encumbrance upon the Silo Receivables;

(g) Seller represents and warrants that Seller is entering this Agreement solely for the purpose of a business and not for personal, family or household purposes;

(h) Seller represents and warrants that it does not engage in activities relating to the following: (i) Guns, gunpowder, ammunitions, weapons, fireworks and other explosives, (ii) illegal drugs, substances designed to mimic illegal drugs, and equipment designed for making or using drugs; or (iii) gambling.

(i) Seller represents and warrants that Seller has the power and authority to enter into and perform all of its Obligations under this Agreement without the consent of any other Person, including without limitation, the power and authority to irrevocably sell, convey and transfer all of the Silo Receivables that are a part thereof to us;

(j) Seller represents and warrants that the Customer Data is true and accurate in all respects and there has been no adverse change since the Customer Data was provided;

(k) Seller represents and warrants that Seller has all licenses, permits, approvals, consents and authorizations necessary for the operation of its business, and all of the foregoing are valid and in full force and effect and Seller conducts its business in accordance with all applicable law;

(l) Seller represents and warrants that there is no claim, suit, litigation, proceeding or investigation pending or threatened against or affecting Seller, other than those provided to Silo in writing. Seller shall promptly notify Silo in writing of any claim, proceeding, litigation or investigation in the future threatened or instituted by or against Seller.

(m) Seller represents and warrants that there are no judgment liens and/or orders of any court or other government or regulatory authority in effect or pending against Seller or Seller's business in particular;

(n) Seller represents and warrants that Seller is able to pay its debts as they come due. Seller represents and warrants that Seller nor its principals has filed a bankruptcy petition prior to the execution of this Agreement and as of its execution, neither Seller nor any of its principals is contemplating filing a bankruptcy petition, declaring insolvency, seeking reorganization, making a general assignment for the benefit of creditors, or commencing any similar action, or contemplating the suspension of or closing of Seller's business, and that neither Seller nor any of its principals has engaged any legal or financial professional to seek advice regarding filing bankruptcy or any similar reorganization process. For clarity, the Parties acknowledge and agree that Seller going bankrupt or going out of business, in and of itself, does not constitute a breach of any representation, warranty, or covenant;

(o) Seller represents and warrants that neither Seller nor any of its principals have been convicted of (or are presently charged with) racketeering, robbery, securities fraud, tax evasion or fraud, telemarketing fraud, wire fraud, insurance fraud or money laundering;

(p) Seller represents and warrants that Seller has paid all necessary and due taxes, including but not limited to employment and sales and use taxes, and shall timely make any payments that Seller is required to make pursuant to, and in accordance with the requirements of, any tax payment programs in which it participates;

(q) Seller represents and warrants that Seller currently has and will maintain insurance in such amounts and against such risks as are customary and necessary to protect Seller's business; and

(r) Seller represents and warrants that Seller has fully disclosed to Silo all facts in relation to Seller's business as are material and which ought to be known to any Person considering the entry into an agreement for the purchase of the Silo Receivables from Seller in the nature of this Agreement.

Each representation and warranty in this Section is made on: (i) on the date of this Agreement; and (ii) on the date any subsequent Order Form becomes part of this Agreement.

## 7. Default.

7.1 <u>Event of Default</u>. Each of the following events constitutes an "Event of Default" under this Agreement:

(a) Seller defaults in the performance of any provision hereof, or of any other agreement now or hereafter entered into with Silo, breaches any covenant or warranty made herein, or any representation contained herein proves to be false in any way, whether material or immaterial.

(b) The occurrence of any event that would cause a lien creditor (as defined in the UCC) other than Silo, to take priority over the Silo Receivables.

(c) Seller violates any term or representation, warranty, or covenant in this Agreement.

(d) Any act by, against, or relating to the Silo Receivables, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other Person, pursuant to court action or otherwise, over all, or any part of the Silo Receivables.

(e) The occurrence of any uninsured loss, theft, damage or destruction to the Silo Receivables.

7.2 <u>Effect of Default</u>. After the occurrence of an Event of Default, and in addition to any other remedies available to Silo at law, in equity or otherwise pursuant to this Agreement, all Obligations shall become due and payable and upon written notice by Silo to Seller. In the event of an Event of Default, Silo will be entitled to damages from Seller in amount equal to the fair market value of the Silo Receivables, and the parties agree that a reasonable estimate for such amount is the Total Remittance Amount less the amount previously remitted by the Seller to Silo under this Agreement. All rights, powers and remedies of Silo in connection with this Agreement may be exercised at any time by Silo after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

7.3 <u>Attorneys' Fees and Costs</u>. To the extent not prohibited by applicable law, and otherwise consistent with the rest of this Agreement, Seller agree to pay to Silo on demand any and all expenses, including, but not limited to, its reasonable attorneys' fees and related costs which may be expended by Silo to obtain or enforce the Obligations hereunder either as against Seller or in the prosecution or defense of any action or concerning

any matter arising out of or connected with the subject matter of this Agreement. Such rights shall be in addition to all other rights and remedies to which Silo may be entitled upon an Event of Default.

## 8. Principal & Personal Guaranty

During the course of your application, you have authorized Silo to collect information with respect to, among other things, the identities, including names, emails, phone numbers, and addresses, of those individuals having a financial and/or ownership interest in the Bank Account. This information has been further authenticated by such individual(s) to Silo. For all purposes of this Agreement, the term Guarantor(s) shall mean those individuals identified as Principal(s) on the Order Form.

8.1 Each Guarantor hereby unconditionally guarantees the performance of Seller's Obligations hereunder. Upon failure by Seller to pay punctually any Obligation, including, without limitation, the prompt payment of Silo Receivables, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Agreement. The obligations of the Guarantors hereunder shall be unconditional and absolute and shall not be released or discharged until any other amount payable by Seller under this Agreement shall have been paid in full. If acceleration of the time for payment of any amount payable under this Agreement is stayed upon the insolvency, bankruptcy or reorganization of Seller, such amount shall nonetheless be payable by the Guarantors hereunder forthwith on demand by Silo. For the avoidance of doubt, this is a guaranty of performance and not payment.

8.2 Each Guarantor authorizes the Seller and Silo to enter into additional Orders Forms that shall constitute part of this Agreement and agrees to guarantee the performance of the Obligations as so amended or varied by such Order Forms.

8.3 This guaranty is a continuing guaranty which shall remain in full force and effect until all the Obligations have been satisfied or performed in full, notwithstanding any intermediate satisfaction or performance of the Obligations by Seller, the Guarantor or any other person.

8.4 The liability of the Guarantor under this guarantee shall not be reduced, discharged or otherwise adversely affected by: (a) any act, omission, matter or thing which would not have discharged or affected the liability of the Guarantor had it been a principal obligor instead of a guarantor; or by (b) any other act or omission except an express written release of the Guarantor by Silo.

8.5 <u>Waivers by Guarantors</u>.

(a) Each Guarantor waives notice of acceptance of this Guaranty, notice of any liabilities or obligations including, without limitation, the Obligations, to which it may apply, presentment, demand for payment, protest, notice of dishonor or nonpayment of any liabilities, notice of intent to accelerate, notice of acceleration, and notice of any suit or the taking of other action by Silo against Seller, the Guarantors or any other Person, any applicable statute of limitations and any other notice to any party liable on any loan document evidencing the Obligations and this Agreement (including Guarantors).

(b) Each Guarantor also hereby waives any claim, right or remedy which such Guarantor may now have or hereafter acquire against Seller that arises hereunder and/or from the performance by any other Guarantor hereunder including, without limitation, any claim, remedy or right of subrogation,

reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of Silo against Seller, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

(c) Guarantors also waive the benefits of any provision of law requiring that Silo exhaust any right or remedy, or take any action, against Seller, any Guarantor, any other Person and/or property including but not limited to the provisions of the California Civil Code Sections 2845, 2849 and 2850, inclusive, as amended, or otherwise. This is a guaranty of payment and not of collection.

8.6 Silo may at any time and from time to time without notice to Guarantors (except as required by law), without incurring responsibility to Guarantors, without impairing, releasing or otherwise affecting the obligations of Guarantor, in whole or in part, and without the indorsement or execution by Guarantors of any additional consent, waiver or guaranty: (a) change the manner, place or terms of payment; (b) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the liabilities or obligations and any offset there against; (c) exercise or refrain from exercising any rights against Seller or others (including the Guarantor) or act or refrain from acting in any other manner; (d) settle or compromise any liability or obligation and subordinate Guarantor's performance of all or any part thereof to the performance of any liability or obligation of any other parties primarily or secondarily liable on any of the liabilities or obligations; (e) release or compromise any liability of Guarantors hereunder or any liability or obligation of any other parties primarily or secondarily liable on any of the liabilities or obligations; or (f) apply any sums from any sources to any liability without regard to any liabilities remaining unpaid. The phrases "liabilities" and "obligations" as used herein shall include, without limitation, the Obligations and this Agreement.

8.7 Guarantor Representations and Warranties

(a) Guarantor shall provide written notification to Silo at least seven days in advance of transferring all or substantially all of Seller's assets. Guarantor shall obtain the written agreement, in a form satisfactory to Silo, of any transferee of substantially all of Seller's assets to assume all of Guarantor's obligations under this Agreement.

(a) If Guarantor is a corporation, limited liability company or other legal entity, Guarantor represents and warrants that it is, and warrants that it will continue to be duly organized, validly existing and in good standing under the laws of the jurisdiction of Guarantor's incorporation, organization or other formation. Guarantor represents and warrants that Guarantor is, and warrants that Guarantor will continue to be, qualified and licensed to do business in all jurisdictions in which any failure to do so would have a material adverse effect on Guarantor or any of its property.

(b) Guarantor has full power and authority to enter into and perform under the Agreement and in doing so will not violate any law or any other agreement to which Guarantor is a party.

(c) Guarantor's obligations under this guaranty shall, when executed, constitute legal, valid, and binding obligations enforceable in accordance with the terms of this guaranty;

(d) Guarantor does not require the consent, approval or authority of any other person to enter into or perform its obligations under this guarantee;

(e) Guarantor's entry into and performance of its obligations under this guarantee will not constitute any breach of or default under any contractual, governmental or public obligation binding on it; and

(f) Guarantor is not engaged in any litigation or arbitration proceedings which might affect its capacity or ability to perform its obligations under this guarantee and to the best of its knowledge no such legal or arbitration proceedings have been threatened or are pending against it.

Each representation and warranty in this Section is made on: (i) on the date of this Agreement; and (ii) on the date any subsequent Order Form becomes part of this Agreement.

## 9. Security Interest

Seller hereby grants Silo a security interest in all of Seller's existing and after-acquired goods, accounts, chattel paper, documents, instruments, general intangibles, and books and records to secure all Obligations.

## 10. Permitted Limit

If the Agreement is subject to a law that sets maximum charges, and that law is interpreted so that the Total Remittance Amount minus the Purchase Price somehow exceeds permitted limits, then (i) any such amount will be reduced by the amount necessary to reduce the Total Remittance Amount to the permitted limit and (ii) if required by applicable law, any sums already received from Seller that exceed the permitted limit will be refunded or credited back to Seller.

## 11. Taxes

It is the responsibility of Seller to determine what, if any, taxes apply to the transaction(s) effectuated by this Agreement, and any profit or loss Seller obtains therefrom. It is the responsibility of Seller to collect, report, withhold, and remit the correct taxes to the appropriate tax authorities.

## 12. Confidentiality

Seller shall hold in strict confidence and treat as the confidential and proprietary property of Silo non-public information provided by Silo to Seller, including information relating to Silo's business processes, that is identified by Silo as confidential or that a reasonable person would understand to be confidential. Seller shall not disclose any such information to any Person, unless authorized to do so in writing by Silo or unless required by law.

Silo will take reasonable efforts to maintain in confidence any non-public information provided by Seller to Silo that is expressly identified by Seller as confidential or that a reasonable person would understand to be confidential. Silo will take reasonable efforts to not disclose confidential and non-public records and information of Seller to any Person, unless authorized to do so by Seller or unless required by law.

## 13. Use of Electronic Records and Signatures

Silo may provide Seller with notifications, disclosures, electronic records, and other communications by posting on the Silo website or mobile application, by e-mail, by short message service ("SMS"), or by regular mail. Silo will use the information that it has on file to contact Seller. Communications to Seller will be considered effective when

sent by Silo to the most recent address or phone number that Seller has provided Silo. Electronic records and signatures may be used in connection with the execution of ACH authorization forms, this Agreement, and other amendments or agreements between the parties.

### 14. SMS Messaging and Telephone Calls.

Seller consent to receive SMS messages (including text messages), and telephone calls (including prerecorded and artificial voice and autodialed) from Silo, its agents, representatives and affiliates, or anyone calling on Silo's behalf at any number Seller has provided to Silo. Seller warrants and represents that the telephone number previously provided to Silo is its business contact number and not someone else's number. Seller represents that it is permitted to receive calls and text messages at the telephone number provided. Seller shall promptly alert Silo whenever Seller stops using a telephone number. Silo, its agents, representatives, and affiliates, and anyone calling on Silo's behalf may use such means of communication described in this section even if Seller will incur costs to receive such phone messages, text messages, e-mails or other means.

Standard message and data rates may apply to all SMS messages (including text messages). Silo may modify or terminate its SMS messaging services from time to time, for any reason, and without notice, including the right to terminate SMS messaging with or without notification, without liability to Seller.

### 15. Indemnification

Seller shall indemnify and hold harmless Silo, its affiliates and their respective officers, directors, employees and agents (the "Indemnified Parties") against and save the Indemnified Parties harmless from all suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated thereby and hereby, and any failure by Seller to perform or observe its obligations under this Agreement. This paragraph excludes any suits, claims, and liability relating solely from Silo's gross negligence or willful misconduct.

### 16. Choice of Law and Forum

This Agreement and all matters relating to the relationship of the parties created hereby is governed by the laws of the State of California. If the parties waive arbitration pursuant to Section 16 of this Agreement: (i) Seller and Silo hereby consent to the jurisdiction and exclusive venue of the state courts in the City and County of San Francisco, California or federal court for the Northern District of California as this Agreement was entered into and made to performed in the San Francisco County, California and to service of process in any such action or proceeding by personal delivery or any other method permitted by law; (ii) Seller and Silo hereby waive any and all rights to object to the jurisdiction and venue of any such court including any claims for forum non convenience, or to transfer or change the venue of such action or proceeding; and (iii) at Silo's sole discretion and election, venue is also permissible in any court having jurisdiction over Seller or Seller's assets.

### 17. Arbitration

PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES THAT ANY DISPUTE SHALL BE RESOLVED BY BINDING ARBITRATION AND THAT (i) SELLER IS GIVING UP ITS RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST SILO OR RELATED THIRD PARTIES; (ii) SELLER IS GIVING UP ITS RIGHT TO HAVE A COURT RESOLVE ANY CLAIM ALLEGED AGAINST SILO OR RELATED THIRD PARTIES; (iii) SELLER IS GIVING UP ITS RIGHT TO SERVE AS A

REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST SILO OR RELATED THIRD PARTIES.

17.1 <u>Scope of Arbitration</u>. Any Dispute arising from or relating in any way to this Agreement or to the relationship formed between the parties as a result of this Agreement, including Disputes regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration administered by the American Arbitration Association ("AAA"). All Disputes are subject to arbitration, no matter what theory they are based on. This includes Disputes based on contract, tort, agency, statute, regulations, or any other source of law. Seller and Silo shall agree on another arbitration forum if the AAA ceases operations. This arbitration agreement applies to all Disputes now in existence or that may arise in the future. Nothing in this Agreement prevents either party's use of (or advancement of any Disputes, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security, or other property interests for contractual debts now or hereafter owned by either party to the other.

17.2 <u>No Class Action</u>. Disputes and remedies sought as part of a class action, private attorney general, or other representative action are subject to arbitration on an individual (non-class, non-representative) basis only, and the arbitrator may award relief only on an individual (non-class, non-representative) basis. The arbitration, or any portion of it, will not be consolidated with any other arbitration and will not be conducted on a class-wide or class action basis. The prohibition against class action contained in this Section shall be non-severable from the remainder of this Section.

17.3 <u>Procedure & Fees</u>. The arbitration will be conducted before a single arbitrator and will be limited solely to the Dispute between Seller and Silo. If either party prevails in the arbitration of any Dispute against the other, the non-prevailing party will reimburse the prevailing party for any fees it paid to the AAA in connection with the arbitration, as well as for any reasonable attorneys' fees incurred by the prevailing party in connection with such arbitration.

17.4 <u>Effect of Arbitration</u>. Any decision rendered in such arbitration proceedings will be final and binding on the parties, and judgment may be entered in a court of competent jurisdiction.

17.5 <u>Miscellaneous</u>. Rules and forms of the AAA may be obtained and Disputes may be filed at any AAA office, www.adr.org, or 335 Madison Avenue, New York, NY 10017, telephone 1-800-778-7879. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

## 18. General

18.1 <u>Notification</u>. A notification to Silo under this Agreement must be delivered to such address as Silo specifies in writing. Such a notification is effective upon receipt.

18.2 <u>Limitation of Liability</u>. In no event will Silo be liable to Seller or a third party for any direct, indirect, incidental, special, consequential, exemplary, liquidated, or punitive damages, including damages under warranty, contract, tort, negligence, or any other claims, arising out of or relating to this Agreement, even if Silo has been advised of the possibility of such damages. Some jurisdictions do not allow the exclusion of

certain warranties or the limitation or exclusion of liability for incidental or consequential damages. Accordingly, some of the above limitations set forth herein may not apply.

18.3 <u>Assignment</u>. Silo may sell one or more participation interests in this Agreement or assign its rights and delegate its duties, in whole or in part, under this Agreement without obtaining Seller's consent or approval. Upon such assignment, Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance under this Agreement by such assignee as if such assignee were Silo. Seller may not assign its rights or delegate its duties, in whole or in part, without prior written consent from Silo, including by operation of law or in connection with any change of control.

18.4 <u>Relationship</u>. The parties are independent contractors (and, as applicable, buyer and seller of accounts), and no joint venture, partnership, employment, or agency relationship or lender-borrower relationship exists between Seller and Silo as a result of this Agreement.

18.5 <u>Whole Agreement</u>. This Agreement, including each Order Form made a part hereof, constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no promises or representations relating to this Agreement that are not incorporated herein, and in deciding to enter into this Agreement, Seller has not relied on anything that any representative of Silo has said that is not expressed in this Agreement.

18.6 <u>Modifications & Waivers</u>. No modification of any provision of this Agreement shall be effective unless it is in writing and signed by each of the parties. No waiver of any provision, condition or right of or under this Agreement shall be effective unless it is in writing and signed by the party against whom the waiver is to be enforced. A waiver is effective, if at all, only with respect to the specific instance involved, and does not constitute a waiver with respect to any future occasion.

18.7 <u>Waiver</u>. The failure of Silo to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Silo in writing. No waiver shall be deemed a continuing waiver or waiver in respect of any subsequent breach or default, whether of similar or different nature, unless expressly so stated in writing. Silo's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Silo would otherwise have.

18.8 <u>Legal Counsel</u>. Seller acknowledges that it has hereby been advised by Silo to consult with legal counsel, and that it has been afforded a full opportunity to consult with legal counsel. Seller represents to Silo that Seller has either consulted with such counsel or voluntarily elected not to do so.

18.9 <u>Counterparts Binding</u>. This Agreement may be executed in multiple copies, each of which will for all purposes constitute one Agreement, binding on the Parties, and each Party hereby promises and agrees to execute all duplicates or replacement counterparts of this Agreement as may be required.

18.10 <u>Survival</u>. All provisions of this Agreement which by their nature should survive termination shall survive termination, including without limitation, Sections 1, 2, and 7 through 11, and 13 through 19.

## 19. Interpretation

Capitalized terms used herein shall have the meanings assigned to them in this Section. The explanations provided in the Order Form are for illustration only, and in the event of a conflict between the following meanings and such explanations, the meanings in this Section control.

(a) "ACH" means Automated clearing house, which is an electronic network for transferring funds between participating financial institutions.

(b) "Bank Account" means Seller's bank account into which all Receivables are deposited and from which Silo will initiate ACH debits, as identified by Seller to Silo.

(c) "Customer Data" has the meaning assigned to it in the Master Subscription Agreement between Seller and Silo.

(d) "Dispute" means any claim, controversy, or dispute between Seller and Silo (or its respective affiliates, agents, directors or employees), whether arising before or during the effective period of this Agreement, and including any claim, controversy, or dispute based on any conduct of Seller or Silo that occurred before the effective date of this Agreement, including any claims relating in any way to the Services, this Agreement, or any other aspect of the parties' relationship.

(e) "Obligations" means all present and future obligations owed by Seller to Silo arising under the Agreement, whether arising before, during or after the commencement of any bankruptcy proceeding in which Seller is a debtor; provided, however, that "Obligations" shall not include payment obligations arising from Events of Assumed Risk.

(f) "Estimated Periodic Remittance" has the meaning set forth in Section 3.2.

(g) "Person" means an individual, a corporation, partnership, limited liability company, association, trust, unincorporated organization, or other legal entity or organization, or a government body.

(h) "Purchase Price" means the amount of funds you request as an advance as specified in each Order Form that is or becomes part of this Agreement.

(i) "Receipts" means the amount collected in cash or cash equivalents on Receivables.

(j) "Receivables" means all of Seller's existing and after-acquired rights to receive payment, whether constituting an account, instrument, chattel paper, payment intangible under Article 9 of the UCC.

(k) "Remittance Period" means the frequency specified each Order Form that is or becomes part of this Agreement, (e.g. weekly or monthly), or the analogous period, as context may require (e.g. week or month).

(l) "Silo Receivables" means the Receivables that Silo purchases from Seller pursuant to the terms of this Agreement.

(m) "Total Remittance Amount" means the Purchase Price plus the multiple of the Purchase Price and the "Fee" specified in each Order Form that is or becomes part of this Agreement.

(n) "Specified Receivables Percentage" means the amount specified in each Order Form that is or becomes part of this Agreement as the "% of Sales."

(o) "UCC" means the Uniform Commercial Code in effect from time to time in the State of California, provided that, if the perfection or effect thereof of the Security Interest in all or any part of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than California, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for such purpose.